[PHILADELPHIA, FEBRUARY 6th, 1837.]

## CROSKEY and Another *against* CORYELL and Another.

IN ERROR.

An agreement under seal was entered into by several persons, principally mechanics and materialmen; in which, after reciting that they had each agreed to erect a brick house on a certain lot, the houses to be of uniform materials and appearance, they thereby agreed that each subscribing party would furnish to the others, certain materials and workmanship—specifying them—to be used in the construction of the said houses, &c.; and it was agreed that no lien should be filed, or claim made against either of the other parties, for any labour or materials furnished, "except against the party, or for the buildings which each shall have agreed to erect, and for such labour and materials only as shall be contained in such building respectively," &c. A., one of the parties to the agreement, filed a lien against the house of B., for lumber. On the trial of the *scire facias*, it appeared that certain items of the plaintiff's bill were not specifically furnished at the date: *Held*, that it was not necessary to prove that the particular articles were furnished to B.'s house—that the terms of the agreement were satisfied, if B. was not charged with more than his due proportion of the materials, and therefore that it was error in the Court below, to charge the jury, that if the particular articles were not actually used in the construction of the building, the plaintiff had failed to file his claim within the six months, and was not entitled to recover.

THIS was a writ of error to the District Court for the City and County of Philadelphia, to remove the record of an action brought by Eliza Croskey, and Joseph A. Clay, copartners, trading as lumber merchants, under the firm of Ashmead & Croskey, against Henry L. Coryell, and Nathaniel Jackson.

The action was a *scire facias* on a mechanic's lien, filed on the 30th of July, 1833, against a certain dwelling house and store, or other building, with the lot thereunto appertaining, situate on the north side of Market street, at the distance of 224 feet east from the east side of Schuylkill Sixth street, containing in front 20 feet, and running thence northward, 170 feet; Henry L. Coryell being the alleged debtor, for the work done, and materials found, and Nathaniel Jackson the alleged owner of the building.

On the trial, on the 3d of May, 1836, before Judge JONES, the plaintiffs gave in evidence, their book of original entries, showing that the materials, for the value of which they claimed a verdict, had been furnished by them to the building.

They then gave in evidence, the record of the lien, and rested their case.

The defendants gave in evidence, the following agreement, under which the materials were furnished:

"We the subscribers hereto, viz.: H. L. Coryell, S. C. Spackman, Black & Brown, D. T. Glenn & Johnson, L. Ellmaker, E. T. Scott, A. Crawford, Israel Byrnes, and Ashmead & Croskey, having each agreed to erect within one year, on ground belonging to L. Ellmaker, situated on the north side of Market street, between Schuylkill Sixth and Seventh streets, as appears by our memorandum of agreement and signature, on a plot of the ground dated May 10th, 1832, a substantial brick store, or a store and dwelling, twenty feet front, and not less than forty-five feet deep, of uniform materials and appearance in front, and of four stories high ; hereby agree that each subscribing ,party hereto, will furnish to the other subscribing parties hereto, the following materials and workmanship necessary for the construction of each and all the buildings above referred to, and to be erected on said lots, as per memorandum and plan thereof, at the regular times required for their application and use, in the construction of said buildings, within this year, and at the following prices for each to each, of the others respectively. Samuel C. Spackman agrees that he will furnish, &c. &c.    *

*    *    *    *    *    *    *    *    *    *    *    *    and that *no lien shall be filed against, or claim made by either party hereto, against either of the other parties, for any labour or materials furnished for or to either of the above mentioned buildings, except against the party or for the building which each shall have agreed to erect, and for such labour and materials only, as shall be contained in such building respectively, &c. &c.*

In witness whereof, we have hereunto respectively set our hands and seals, this sixteenth day of May, 1832."

The defendants then examined witnesses to prove that the two last items of the plaintiffs' bill, the last three being as follows, namely:

"1833.  January 10th.  To lumber,    .    "    =    $ 1 73
    February 7th.  To ditto for shutters, 11 feet pan-
      nel boards $3\frac{1}{2}$—39, $7\frac{1}{2}$ inch poplar do. $3\frac{1}{2}$—25,    64
    March 5th,  omitted February 5th, for each, 98
      feet 5-4 and 2 inch pannel plank, 4—3.56,    3 56

                                      $560 98
By bill for materials, &c.    "    .    .    250 09

                                      $ 310 88"

Were not furnished according to the entries in the plaintiffs' books.

(Croskey v. Coryell.)

The consequence of the exclusion of these two last items would be that the plaintiffs' lien was filed too late, and not within the six months after furnishing the materials.

The plaintiffs then gave evidence in contradiction of the defendants' evidence; and among other things, they gave in evidence the following promissory notes, namely:

1.　　　　　Philadelphia, 10th July, 1833.
Dolls. 310 89.
　Ninety days after date, I promise to pay Ashmead & Croskey, or order, three hundred and ten dollars ninety-eight cents, without defalcation, for value received.
　　　Endorsed,　　　　　NATHANIEL JACKSON.
　Ashmead & Croskey.

2.　　　　　Philadelphia, October 10th, 1833.
Dollars 315 91.
　Ninety days after date, I promise to pay to Ashmead & Croskey, or order, three hundred and fifteen dollars ninety-one cents, without defalcation, for value received.
　　　Endorsed,　　　　　NATHANIEL JACKSON.
　Ashmead & Croskey.

3.　　　　　Philadelphia, January 12th, 1834.
Dollars 321 06.
　Ninety days after date, I promise to pay Ashmead & Croskey, or order, three hundred and twenty-one dollars and six cents, without defalcation, for value received.
　　　Endorsed,　　　　　NATHANIEL JACKSON.
　Ashmead & Croskey.

4.　　　　　Philadelphia, April 18th, 1834.
Dollars 323 06.
　Thirty days after date, I promise to pay to the order of Ashmead & Croskey, three hundred and twenty-three dollars and six cents, without defalcation, for value received.
　　　Endorsed,　　　　　NATHANIEL JACKSON.
　Ashmead & Croskey.

And they called Henry Croskey, a clerk of the plaintiffs', who said "I handed Jackson a bill containing the two items," (*i. e. the two last items aforementioned, which the object of the defendants' testimony was to strike out of the bill;*) "he included their amount in the note he gave me," (*i. e. the note aforementioned, for $310 89, dated in July,* 1833;) "he made a slight objection, saying he had left the notice," (*i. e. a notice alleged by the defendants, to have been left*

(Croskey *v.* Coryell.)

*by Jackson at the plaintiffs' lumber yard, previously to the date of the two disputed items directing them to supply no more lumber, but which notice, the plaintiffs' witnesses declared was never received by the plaintiffs;)* "Jackson renewed his note several times, always including the two items." "It" (*i. e. the note,*) "is now unpaid." The same witness for the plaintiffs' also said, "the lumber was charged in ninths to each house," (*there were nine houses,*) "up to the time of enclosing the houses; up to that time, the houses were alike, so that each took the same quantity of stuff."

The plaintiffs also gave in evidence, the following deeds of conveyance of the premises, against which the lien was filed, viz.:

Levi Ellmaker and wife, to Henry L. Coryell, 31st May, 1832. Recorded 21st August, 1833.

Henry L. Coryell and wife, to Nathaniel Jackson, 8th November, 1832. Recorded 21st August, 1833.

Nathaniel Jackson and wife, to Alex: J. Reid, 20th July, 1833. Recorded 21st August, 1833.

Alex: J. Reid and wife, to Robert Fleming, 27th July, 1833. Recorded.

Robert Fleming to Charles Stokes, 25th October, 1833. Recorded 28th October, 1833.

The four last mentioned deeds, containing clauses each of a special warranty—

And a declaration of trust by Charles Stokes, in favour of Mrs. Sophia B. Potts, the present owner of the premises, dated the 25th October, 1832.

The plaintiffs contended,

1. That the two last items of their bill were lumber supplied to the building, and used therein.

2. That the agreement of 16th May, 1832, did not exclude the plaintiffs from recovering for any materials not actually used in the building, or furnished for it. But that the clause of the agreement *in .Italics*, on which the defendants relied, as showing such to be the case, was intended by the parties to it to guard against the filing of *joint liens*, and not to reduce a party filing a lien, to the necessity of proving that the materials or labour, for which the lien was filed, were actually or literally " *contained*" in the building against which it was filed. That the agreement meant that no building should pay for *more labour and materials* than it contained, and not that it should pay for only the *identical labour and materials* it contained. That it was impossible to put into practical operation such a theory of the contract. That it was calculated to destroy the plaintiffs' claim, not only to the last two items of their bill, but to *all* the items. For they never had pretended or attempted to

(Croskey v. Coryell.)

trace any of their items of charge into this particular building. They had simply charged according to the testimony of their clerk, *one-ninth* of the lumber furnished by them to each of the nine houses. It was not pretended that the defendant's house was charged with more lumber than it contained. The houses were all exactly alike, according to the evidence, in all their parts, until they came to be *enclosed,* and all the items of the bill were for lumber to be used *previous to enclosing*—which testimony was as follows. "The lumber was charged in ninths to each house, up to the time of enclosing the houses—up to that time the houses were alike, so that each took the same quantity of stuff."

Horatio G. Jones, a witness for the defendants, testified as follows on the subject of the lumber which composed one of the last two items. "I made the shutters for the second story of all the buildings, with the exception of two pair. I framed the shutters for the whole of the houses pretty much at one time; but the first pair of shutters that I finished off were for Mr. Jackson's house. I had an order from Glenn & Johnson for $15; he would not accept; asked his reasons; said Glenn was not getting on, and agreed, that if I would finish the shutters forthwith, he would let me have the order. He did, and I finished them off. The shutters for Jackson's house were made out of the first lot of stuff I got."

3. The plaintiffs contended that the notes given by Jackson, including in their amount the two items now disputed, at a time when the lien might have been filed within six months, counting the six months from the dates of the undisputed items, and thus preventing all difficulty as to the time of filing the lien, forbade Jackson, and all claiming under him, from disputing now the correctness of those two items, more especially as the plaintiffs acted on the admission implied by Jackson's giving the note in forbearing to file this lien.

That Jackson cannot, first by giving the notes, including the two items, get an indulgence of time from the plaintiffs, and prevent their filing their lien immediately; and then, having obtained that end, turn round upon the plaintiffs and deny the validity of the lien, upon the very ground of the time having been given.

The Judge charged as follows:—

"The construction of this agreement is matter of law. The object of it is to make each party and each building responsible for such materials only as shall be contained in the respective buildings. This is the language of it, and it is very explicit. It would be doing violence to the language to make it mean anything else. Whatever, therefore, may be the effect of the act of assembly, the agreement

would control it. Parties may contract as they please, and if they do not like the liability which would arise at law upon the general contract, they may vary it by a special agreement. If you believe, therefore, the testimony of Horatio G. Jones, this item of 64 cents is out of the question. Now as to the matter of the sash, the question is, whether the stuff for the sash in this building, or any of it, was procured on the 5th of February. (The Judge then adverted to the testimony on this point.) The note given by Jackson to the plaintiffs, is said by their counsel to conclude the defendant from objecting to the last two items of the bill. But it has not that effect. Jackson at first objected to the including of these items in the note, but finally assented to it. The including of these items in the note, is not conclusive evidence against the defendant, that the lumber was used in the building. You will inquire into the truth of the matter. But it is a circumstance for your consideration, and you will give such weight to it, in connexion with the evidence in the cause, as you think it deserves."

The plaintiffs' counsel excepted to this charge, and the jury having found a verdict for the defendants, removed the record, and assigned the following errors.

1. " That the judge erred in charging the jury, that the plaintiffs below must show that the very materials charged to the defendants, were contained in Jackson's building.

2. That the judge erred in charging the jury that the notes given by Jackson did not conclude him, and those who took defence and claimed under him, from denying the items of the plaintiffs' bill, as included in and acknowledged by the notes.

3. That the judge erred in charging that the only question for the jury was, whether the last two items of the bill of lumber were contained in the building, and that the admission implied by the notes was nothing more than a circumstance to be considered in the question, whether the lumber of the last two items of the bill, was or was not contained in the building."

Mr. *C. Ingersoll* for the plaintiff in error.

The defence in the court below was urged chiefly on the ground of the agreement between the mechanics, &c. by which in effect nothing more is provided than that each building should be charged for its own labour and materials, which is no more than the act of 1831 provides for. I contend that the limitation in the agreement refers to quantity and not to specific articles. *Platt on Covenants*, 137–8.

2. The agreement between the plaintiffs and Jackson, at that time the owner of the building, by which the bill was admitted, concludes

(Croskey v. Coryell.)

all claiming under him. *Knox* v. *Whalley,* (1 *Esp. Ca.* 159.) *Schwartz* v. *Moore,* (5 *Serg. & Rawle,* 265–6.)

Mr. *Dallas, contra.*

Under the agreement it must be shown that each article went into the building. The agreement did not require similarity in the plan of the buildings, except as to the fronts; and hence it cannot be contended that they were to be charged by equal parts for the lumber furnished. The court below left the question of the notes to the jury as evidence, though not conclusive, that the last items in the account were used in the building.

The opinion of the court was delivered by

KENNEDY, J.—All the errors assigned here seem to grow out of the construction put by the judge of the District Court upon the agreement of the 16th of May, 1832, which was given in evidence on the trial of the cause. If the agreement were susceptible of no other construction than that given by the judge in his charge to the jury, we are not prepared to say that his instruction on the other matters excepted to, could have been considered erroneous. We however think that his honour erred in directing the jury, that if they should be of opinion from the evidence, that the two last items, consisting of panel boards or plank, charged by the plaintiffs in their books on the 5th and 7th of February, 1833, and furnished by them for window-shutters to the house in question, were not actually used for that or any other purpose in the construction thereof, the plaintiffs had failed to file their claim within the time prescribed by law, for the materials furnished by them and actually used in building of the house; and having thus lost their lien, the jury ought to find for the defendants. That materials of the *like kind* with those charged in the two last items, were furnished by the plaintiffs and used in the construction of the house of the defendant is not denied. But then it is contended that the house is not chargeable with the materials mentioned in these two items; because according to the terms of the agreement, unless they be the identical materials that were actually used in the construction of the house, they were not to become a lien thereon. And this, it seems, was the opinion entertained by the judge of the District Court, and by him delivered in his charge to the jury. Now although that part of the agreement which declares " that no lien shall be filed against, or claim made by either party thereto against either of the other parties for any labour or materials furnished for or to either of the above mentioned buildings, except against the party or for the building, which each shall have agreed to erect, and for such labour and *materials only as shall be contained in such building respectively,*" might very well admit of this construction; yet when the subject-matter of the agreement, and

(Croskey *v.* Coryell.)

the various occupations and employments of the several parties thereto, together with the other provisions contained therein, are all taken into view, we are inclined to think that this could not have been intended by the parties; and if it were not, it certainly ought not to prevail. By the agreement, it appears that the parties, who were nine in number, and of the various occupations usually employed in the building of houses, such as material-men and mechanics, had agreed to erect within the course of a year thereafter, nine buildings, that is, a house for each one of the parties severally, adjoining to each other on the north side of Market street in this city, between Schuylkill 6th and 7th streets, each building to be "a substantial brick store, or a store and dwelling, twenty feet front, and not less than forty-five feet deep, of *uniform materials and appearance in front, and of four stories high.*" Some of the parties to the agreement being mechanics, whose labour was requisite in the construction of the buildings, each was to do all that kind of work necessary to be done in his particular art; and others being material-men and lumber-men, whose business it was, to furnish the lumber and materials necessary for the erection and completion of the buildings, each of them was to provide and furnish in his particular line of business, the lumber and materials wanting; and accordingly it was agreed, among other things, "that each subscribing party thereto should furnish to the other subscribing parties thereto, the following materials and workmanship necessary for the construction of each and all the buildings, &c. at the regular times required for their application and use in the construction of said buildings, within the year, and at the following prices for each to each of the others respectively, &c." And then follows the prices at which each one in his particular line of business was to do his work, or to provide and furnish the requisite lumber and materials. Now it is evident from the whole tenor of the agreement, that it was the intent of the parties, that the nine buildings should all be carried up and built at the same time. And one of the parties, being a brickmaker, was to provide and furnish brick in the progress of the building thereof, as they should be wanted; and another of the parties, being a bricklayer, was to lay all the brick, and to be employed in carrying up the front walls of the nine buildings together, and at the same time; and a third of the parties, being a lime merchant or burner, was to furnish the lime as it should be wanted for the purpose of making mortar to lay the bricks with. It was not expected, nor could it well be, that the same cart load of brick or lime would be put into the same building, nor in any given number of them. The brick thus brought, from the nature of the work, the time and manner of doing it, and the same person having to lay all the brick, would be almost of necessity distributed and used in the building of two, three, or more of the contiguous buildings, if not occasionally among the whole. The bricklayer, who

(Croskey v. Coryell.)

has his hands employed under him and at work in laying brick at the same time throughout the whole line of the front of the nine houses, says to the party who is the brickmaker, you must furnish me with so many thousand bricks every day for the front of the nine buildings, until it is finished; the brickmaker of course is bound to do so, and accordingly does it; but having done it, it is obvious that it will not be very practicable for him, under such an arrangement, to know or to prove in what particular building or number of the nine, any one thousand of the brick so furnished on the same day, were used; and much less would it be practicable to show the particular number and proportion of the thousand brick used in each house. But as the same quantity and quality of brick were to be used in the front of each building, it would be sufficient, in order that each house might not be charged with more than the actual quantity used in it, which was the only object that the parties could have had in view in introducing into the agreement the clause in question, to charge each building with one ninth of the brick so furnished from time to time as they were delivered. And this, according to the evidence, seems to have been the rule that was adopted by the plaintiffs; whose business it was under the agreement, to provide and furnish the lumber and materials necessary for the carpenter work of the buildings. And certainly there does not appear to be any good reason why it would not be quite as impracticable for them to ascertain in what particular house, or number of the nine houses, any part of the lumber furnished by them was actually used, as it would be for the brickmaker to establish in which of the buildings, whether in one or all of them, the brick furnished by him on any one day, had been actually used. Suppose the party who is the carpenter, and bound by the agreement to do the carpenter work of the nine buildings, calls upon the plaintiffs and says to them: I want lumber or materials of a particular description for making the window-sash or the window-shutters that are to be used in the front of the nine buildings, where the work and materials were to be precisely the same in each, so that the whole when finished, might exhibit in front on Market street, a perfect uniformity of appearance. It becomes the duty of the plaintiff, upon such request, to furnish the materials for this purpose; and if a part of the requisite quantity only can be supplied on the same day, but still as much as is wanted for the time being, and to keep the hands of the carpenter continuously employed, it is not likely that even the carpenter himself would be able to tell, after the whole work was finished, in which of the buildings, or whether in all or only in a part, the materials so furnished on that day had been used; and certainly much less able would the plaintiffs be to do so. Charging therefore each building with its due proportion of the lumber and materials so furnished, and with no more in amount than has been actually used in the construction of it, seems to be not only

(Croskey *v.* Coryell.)

just and equitable, according to the tenor of the agreement, but the only practicable rule that can be adopted and applied to the case.

It cannot be pretended that it was not the intent of the parties, that each one should have a lien against each building separately, excepting his own, for the price of the work and labour performed by him in the construction of it, or for the lumber and materials actually used in the execution thereof; and hence as long as the rule adopted and applied does no more than charge this amount, it is clear that no injustice is produced by it. Nothing more seems to be done by the application of the rule here; but what seems to make it the rule which the parties by their agreement must have intended, is, that it is almost the only practicable one which the plaintiffs had it in their power to resort to, and apply to their case. The subject-matter of the contract, the manner in which the parties by their agreement contemplated it should be executed, and their various occupations all tend to show that the clause in the agreement, which declares "that no lien shall be filed, and claim made by either party thereto against either of the other parties, &c. except for *such* labour and materials only, as shall be contained in such building," was intended merely to protect each one of the parties and his buildings, from being charged with more labour and materials, than should be actually performed and used in the construction of it. Besides, it is by no means clear that this construction is not in conformity with the literal meaning of the words employed therein, for it is only by giving to the word "such" immediately preceding the words "labour and materials," the meaning of the word "same" that it can be said that this construction of the clause is not strictly a literal one. But the word "such," although used sometimes to identify or denote the *same* thing previously mentioned, yet it is frequently used and intended to denote things of *the like kind;* and taking it in this sense here, it renders our construction of the clause not only literal, but makes it comport with what seems to have been the chief design of the parties. But if a doubt existed in this respect, the settlement made between the plaintiffs and N. Jackson, one of the defendants to this suit, being then the owner of the building in question, on the 10th of January, 1833, ought to remove it; for though he, (Jackson,) made some objection at first, yet he agreed that the two last items should be charged; and he accordingly gave his note for the amount of the plaintiffs' claim, including them. But according to the express terms of the agreement, neither he nor the building was to be charged therewith, unless *such* materials as are mentioned in these items, were *contained* in the building. If he was properly chargeable with them, then the building was equally so. In closing the account, and by giving his note to the plaintiffs for an amount including these items, without even an allegation now that it was done through either fraud or mistake, he has shown that according to their understanding of the agreement, these items were properly chargeable against him-

(Croskey *v.* Coryell.)

self as the owner then of the building, and of course against the building itself. For we have seen that the words of the agreement in regard to this are "that no lien shall be filed or *claim made* by either party thereto *against either of the other parties, &c.* except for *such* labour and materials only as shall be *contained* in such buildings."

The judgment is reversed, and a *venire facias de novo* awarded.